[No. 2009.]

## MIKE NILAND v. THE STATE.

1. PRACTICE — CHARGE OF THE COURT.— It is expressly provided by statute, that the charge of the court shall distinctly set forth the law of the case. If it fails to do so, and an exception is reserved to it, and shown by proper bill on appeal to this court, then it becomes the duty of this court to reverse the case for the error, without inquiry as to the effect such error may have had upon the result of the trial.

2. SAME — MANSLAUGHTER — ADEQUATE CAUSE. — Subdivision 4 of article 597 of the Penal Code makes insulting words or conduct towards a female relative of the slayer an adequate cause to reduce a homicide from murder to manslaughter, provided (article 598) the killing occurred immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party killing may meet the party killed, after he has been informed of such insults. Under these provisions, one of the principal ingredients of ordinary manslaughter, *i. e.*, that the provocation must arise at the time of the killing and that the passion be not the result of a former provocation, is not applicable to a case where the insulting words or conduct were not indulged in in the presence of the slayer. That the slayer was present and saw the insulting conduct or heard the insulting words is not required, but he may kill on the first meeting after learning of the commission of the provocation. Up to the time of the first meeting the law prescribes no limit to the subsidence of the passion, and the period of time elapsing between the slayer's first information of the provocation and his first meeting with the person slain is immaterial. The trial court, therefore, in charging the law of manslaughter, in a case of this kind, erred in charging that "the provocation must arise at the time of commission of the offense, and the passion must not be the result of a former provocation."

3. INDICTMENT — ARREST OF JUDGMENT. — Objection that the indictment does not show upon its face, nor aver in terms, that it was presented in the district court is an objection which goes to the form and not the substance of the indictment, and, therefore, though available in a motion to quash, is beyond the reach of a motion in arrest of judgment, because "a motion in arrest of judgment shall be granted upon any ground which would be good upon exceptions to an indictment or information for any substantial defect therein."

APPEAL from the District Court of Nueces. Tried below before the Hon. J. C. Russell.

The indictment in this case charged the appellant with the murder of Albert Sheldon, in Nueces county, Texas, on the 4th day of August, 1885. His trial resulted in his conviction of manslaughter, and his term of imprisonment in the penitentiary was affixed at five years.

Ben Sheldon, a brother of the deceased, was the first witness for the State. He testified that Albert Sheldon died in Corpus Christi, Texas, on the night of August 4, 1885, from the effects of pistol shots which he, the deceased, told the witness were inflicted by the defendant. He died between 8 and 9 o'clock, P. M., in a Mexican jacal, about one hundred and fifty yards distant from defendant's house. Mr. Welch, Doctor Spohn, Mr. Scott, Joseph Fitzsimmons, Tom Craven, Doctor Turpin, Tom McComb and witness were present when he died. The deceased made a statement before he died. He said: " Brother, I know I am going to die." Witness told him that he was. He then raised himself, turned over, kissed the wit-

ness, told him good-bye, and charged him to tell his mother and sister good-bye for him. Witness then told him to tell him why he had been shot; but he made no reply. He expressed no hope of recovery, and said nothing more about his impending death. Witness asked him who shot him, and he replied: "Mike." Witness then asked him why Mike shot him, and he said that he did not know; that Niland called him out and shot him; that he ran and Niland pursued him to the Mexican jacal and shot him the last time. He died within fifteen or twenty minutes after he made the statement recited by witness. He was rational and in his right mind to the last moment. Witness did not know the proprietor of the jacal.

Doctor Spohn, the next witness for the State, described the five wounds on the body of the deceased, and declared that his death resulted from the wounds.

Severo Torres, for the State, testified, in substance, that he owned and occupied the jacal or cabin in which the deceased died. That jacal was situated a half square distant from, and opposite, the house of the defendant. He knew the defendant personally, and the deceased by sight. He had often seen the deceased at the defendant's house. The witness was not at home when the first shots were fired. He heard three shots in his neighborhood and started home. Deceased ran into witness's house, and, as the witness was about to go in his house to put him out, the defendant came up and asked witness: "Where is that man who ran into your house?" Witness replied that he did not know. Defendant then went into the house, said something in English which witness did not understand, and shot the deceased. Witness saw nothing more, but went to town to summon a policeman. No one else was in witness's house when witness arrived, his wife having run out. Sheldon died in the witness's house about one and a half hours after he was shot.

Matilda Resuedes, the wife of Severo Torres, testified, for the State, that she knew neither the defendant nor the deceased. On the night of the tragedy she heard three pistol shots near her house, and in a few minutes the deceased ran into her house, and she caught up her child and ran out. Within a minute the defendant ran up with a pistol in his hand and asked the witness where the deceased was. Witness told him. Defendant then ran into her house, and almost immediately the witness heard another shot. Witness was in her kitchen when she heard the first three shots. The defendant said nothing that witness heard when he went into witness's house, but fired his pistol as soon as he got in.

Fanny Cook was the next witness for the State. She testified

that she was at the door of the jacal at the time of the death of the deceased. Witness was on the streets of Corpus Christi when the first shots were fired. She could not say how far she was from Niland's house. Two shots sounded to witness like they were fired inside of a house, and in the direction of Niland's house. Looking in that direction witness saw deceased in front of Niland's house, running from the direction of Niland's house. She then turned an adjacent corner, and saw Niland going after the deceased. He was not running, nor did he do anything that the witness saw, nor did the witness know, at that time, that he had done anything. Witness saw the deceased run into the Mexican house, but did not see the defendant go into that house. She then heard one or two more shots, but was unable to say whether or not they were fired inside of the house.

Miss Mary Hayes testified, for the State, that she was visiting at Niland's house at the time that Sheldon was killed. She was sitting on the back gallery steps early on that night, and heard some one talking in Niland's house, and presently heard some shots fired in that house. She did not know who the parties were that did the talking, nor did she know who did the shooting. She did not know how many shots were fired, nor where Sheldon was at the time they were fired. Ten minutes before, he was at the front door of Niland's house. Witness did not hear his voice that night. Just before the shots were fired the witness saw Mrs. Niland in the kitchen, standing before the stove, but she was not at home at supper that night. Witness saw nothing more of Niland or Sheldon on that night. Witness left Niland's house after the shooting, being afraid to stay there that night. She went into Mrs. Dunn's yard and thence to Mr. Bagnal's house. Mrs. Niland after a time called witness, and witness went back. Mrs. Niland was then crying, apparently in great distress. When the witness last saw the deceased he was standing in Niland's front door. He may have gone into the kitchen, but, if so, witness did not know it. The State closed.

John Weis was the first witness introduced by the defense. He testified that, after supper on the fatal night, he was standing at the corner of Mushaway's store in Corpus Christi, in company with Peyton Smythe, Jr., and Mr. Hickey (Mr. Bagnal having just left), when Mr. Niland appeared on the opposite corner, and called to the party: "Boys, come here." The parties named joined him, and he said: "I want to ask you as friends; have you ever heard Sheldon slander my wife?" Witness replied: "I have; disgracefully."

Niland then said: " Tell it." Witness then said to Niland: "He has told me that he has ' banged' Mrs. Niland; he has thrown it up to me and told me to go up on the hill and tackle old Ellen; that he did not have to go up·there, as he got his at the house. He told me that the row between Mrs. Dunn and Mrs. Niland arose from Mrs. Dunn's discovering him and Mrs. Niland in bed together." Witness further told Mr. Niland that he thought he ought to have told him before, and would have done so but for the disgrace; that he asked Sheldon why he talked in that manner of Niland's wife, in view of the fact that Niland had treated him as a profound friend, and had taken him off the street and given him work. Witness further told Niland that Sheldon not only told him once that he had " banged " Mrs. Niland, but told him so many times; that he often threw up old Ellen to witness, and said that he was " very well treated at the house," and wondered why the ladies generally were so stuck on the Sheldon boys; that one day Mrs. Niland came to him, threw her arms about him and said " O! if Mike was always out of the room;" that he told witness that Mike Niland was not sharp enough to catch him, and that he was ready and willing to die.

It was fully half-past 7 o'clock at night when witness made these disclosures to Niland. Niland was very much excited when he called witness, and he spoke his demand in such a way that witness felt compelled to tell him the facts. After the witness had told him these facts, Niland turned to Peyton Smythe, and asked him what he had heard. He and Smythe stood in conversation some ten or fifteen minutes. Niland then said that he would see witness again, and started up the street with Mr. Hickey. This could not have been more than fifteen or twenty minutes before he killed Sheldon. The word " bang," as used by Sheldon with reference to Mrs. Niland, meant criminal intercourse. The relations between the defendant and the deceased up to that night had been of the friendliest character. Sheldon ate and slept at Niland's house, and worked for Niland under the witness as Niland's foreman.

On his cross-examination, the witness testified that he did not go home with Niland on the night of the killing. The conversation in which witness disclosed to Niland Sheldon's statements about his carnal intercourse with Mrs. Niland, occurred at Hayden's corner opposite · Mushaway's store. Only Smythe and Hickey were present, Mr. Bagnal having just left. Witness saw the defendant under guard at the court-house after the shooting. Niland had never talked to witness about his wife and Sheldon before. The

first time that Sheldon ever said anything to witness about his relations with Mrs. Niland was a day or two before the April elections. The matter was often talked over by the boys in the shop, with much anxiety as to how it would probably end. Witness assisted in preparing Sheldon's body for burial. He did not see him killed, and only knew that he was killed some fifteen or twenty minutes after his conversation with Niland, by hearing the police whistle at that time, and being told by City Policeman Brennan that Niland had killed Sheldon.

Mrs. Catherine Dunn testified, for the defense, that she was the mother of the defendant's wife. Niland came to witness's house after supper on the night of the killing, and said to witness: "I suppose you are not glad to see me." Witness replied: "Neither glad nor sorry." He then said: "I want to know why you spoke to me as you did to-day" — referring to a previous interview. Witness replied: "Because I have heard that Albert Sheldon has been talking disparagingly of my daughter." Niland replied that he did not believe it; that he had treated Sheldon too well for him to do such a thing. Witness replied that she did believe it, and advised Niland to ask his workmen to tell him the truth about it. Niland replied that he believed it was some old woman's talk. Witness replied that it was not, felt hurt that Niland did not believe her, and at once questioned his affection for his wife. Defendant soon left, and in a few minutes repassed witness's house, going towards home in a fast walk, and shortly afterwards witness heard several shots. Witness presently heard that Niland had killed Sheldon. The previous relations between defendant and deceased were of the friendliest character,— Niland's house being Sheldon's home.

Cross-examined, the witness stated that she first told Niland of Sheldon's talk about his wife, at her home, on the night of August 4, 1885, the night on which the killing occurred. Witness went to Niland's shop about 11 o'clock on that day to demand Sheldon's discharge, but Niland was out. She asked Mr. Hickey, who was the only workman in the shop, when she would find Niland in. He said at noon. Witness returned to the shop at noon, but Niland was still absent, and she told Hickey to tell Niland as soon as he returned that she wanted him, Niland, to put Sheldon out of his house. Mr. Hickey said to witness: "Wait; the men are going to tell Mr. Niland. We have tried to get Sheldon to go away, and I believe he will go in a few days." Witness met Niland on her way home. She had a cowhide in her hand. She shook the cowhide, and said to Niland: "If I see Albert Sheldon, I shall cowhide

him." Niland replied: "You had better attend to your own busi-ness." Witness said nothing more, remembering on the instant that she had promised to await the men's disclosures to Niland or the departure of Sheldon.

Peyton Smythe, Jr., was the next witness for the defense. He testified substantially as did Weis as to meeting defendant at Hay-den's corner, opposite Mushaway's store, and as to the conversation between Weis and defendant. After Weis made his disclosures to Niland, witness told Niland that Sheldon had said pretty much the same things to him, *i. e.:* that he, Sheldon, had been sleeping with and "banging" Mrs. Niland; that Sheldon first told witness he was "banging" Mrs. Niland, between the 1st and 14th of the previous April, while at work on Mr. Rivera's house; and that he several times made such statement to witness, and often told wit-ness that Mrs. Dunn was very angry because she had caught him, Sheldon, and Mrs. Niland sleeping together. Niland then said "come on" to Mr. Hickey, and the shooting occurred some fifteen or twenty minutes later.

Cross-examined, the witness stated that some little time after the shooting he saw Niland in front of Gussett's store. Niland said "Hallo, Peyton, is that you?" Witness replying affirmatively, Niland said, "I have killed my man." Witness had never said to the brother of deceased that Niland's words at that time were: "I have done the boy up brown." The corner conversation on that night was the first in which witness had ever told Niland of what Sheldon had said about his wife. The matter would never have reached Niland's ears if left to the shop boys. It had been talked over by Niland's employees, and they had tried to get Sheldon to leave. Weis had discharged Sheldon because the other employees had noti-fied him they would not work longer in company with Sheldon. When witness met Niland after the shooting, he told witness that he was going to give himself up. He was then alone. This was about half-past 8. Witness denied that he had ever told a young lady that the statements made by Sheldon were not com-municated to Niland until after the shooting, and that he had known for a week that Sheldon was to be killed. Sheldon was twenty-one years old when he was killed.

Tom Mussellman testified, for the defense, that he boarded at Niland's house, and slept at Mrs. Allen's, in August, 1885. He took supper at Niland's house about half-past 6 o'clock on the evening of the killing. Niland, Sheldon and the witness were the parties at the table together. Everything then seemed pleasant between

all parties.  Witness left Niland's house alone, about a quarter before 7 o'clock, leaving Sheldon and Niland alone in the house. About half-past 7 the witness met Niland and Hickey near Gussett's lumber yard, going towards the court-house.  Hickey walked on ahead; Niland stopped witness and said: "Tom, I want you to tell me the truth about this talk of Sheldon about my wife." Niland appeared very much excited.  Witness said to him: "Mr. Niland, Mr. Sheldon told me that he had had frequent criminal intercourse with your wife; that you have kept him in your house, boarded him, clothed him, given him money to spend, and that he did not have to leave the house to go after women."  Niland then went on up the street in a very excited state of mind.  Witness did not know when the shooting occurred.  He was on his way to the wharf when he heard of it, some time later.

On his cross-examination the witness denied that he said in the presence of the dead body, the Shaws and Ben Sheldon that he walked to the foot of the hill with Niland, which statement would have been contrary to a statement he made in his examination in chief.  He did not say in that presence that he told Niland of Sheldon's statements after the shooting and not before.  Witness did not know where Niland went to after supper on the night of the killing.

Jeremiah Hickey was the next and the last witness for the defense. He testified that he knew nothing of Sheldon's statements about his relations with Mrs. Niland except by hearsay.  Witness was at Mushaway's corner with Weis and Smythe when Niland called them across the street.  Weis and Smythe, in response to Niland's request, told what they had heard Sheldon say.  Niland then turned to witness and said: "Come on with me."  He acted strangely and said that he was ruined, or ruined for life.  Witness walked with him towards his home, as far as his, witness's, house, and then left him.  He spoke to Niland once or twice *en route*, but Niland did not reply.  Niland asked for his pistol, which was then at witness's house, and witness's wife gave it to him.  Niland left, and returned about thirty minutes later in company with his wife.  He then had his pistol in his hand and looked very much excited.  He called to witness to go with him, but his wife took him off.

The motion for new trial presented the questions discussed in the opinion.

*McCampbell & Givens, Stanley Welch* and *D. Givens,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

White, Presiding Judge. Under an indictment charging him with the murder of Albert Sheldon appellant was convicted of manslaughter, with punishment annexed at five years in the penitentiary.

As made by the evidence the defense was on account of insulting and grossly slanderous remarks and statements made by deceased about the wife of defendant. The killing occurred in a very short while after defendant was told of these statements. On this appeal the principal grounds of complaint are based upon supposed errors contained in the charge of the court to the jury.

With regard to the charge, it is provided that it shall distinctly set forth the law applicable to the case. (Code Crim. Proc., art. 677.) If it fails to do so, and an exception is reserved to it and shown by bill of exception, on appeal to this court, "then it is the duty of this court to reverse the case for the error, without further inquiry as to the effect such error may have had upon the result of the trial." (Code Crim. Proc., arts. 685, 686; *Mace* v. *The State*, 9 Texas Ct. App., 110; *Vincent* v. *The State*, id., 303; *Williams* v. *The State*, 10 Texas Ct. App., 8; *McGrew* v. *The State*, id., 539; *Maddox* v. *The State*, 12 Texas Ct. App., 429; *Mason* v. *The State*, 15 Texas Ct. App., 534; *Goode* v. *The State*, 16 Texas Ct. App., 411; *White* v. *The State*, 17 Texas Ct. App., 188.)

In this case the charge was promptly excepted to by defendant, when given. Let us inquire in what particulars, if any, it is erroneous, and, inasmuch as appellant was convicted of manslaughter, we will address ourselves to that part of the charge relating to manslaughter. The statutory definition and the statutory explanation of terms used in the definition were given as they are found in the Penal Code, arts. 593, 594, 595, subdivision 4, of article 597, and articles 598, 600, and 602, with this difference, that in copying article 594, subdivision 1, the word *passion* is substituted for the word "*provocation*," where it is said that "the *provocation* must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation."

The question is: where "insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide" is the adequate cause relied on to reduce a homicide from murder to the grade of manslaughter (subdivision 4, art. 597), is it not erroneous to charge "that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation," as is explained in subdivision 1, article 594? We think so. This very question was discussed in the Eanes case, 10 Texas Ct. App., 445, and it was there said that "the general rules with regard to ordinary cases of manslaughter are necessarily

modified by our statute in permitting this defense. It is expressly provided that ' insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide' (Penal Code, art. 597, subdiv. 4) shall be deemed an adequate cause to reduce a homicide from murder to manslaughter. Not only so, but the statute further provides that such cause shall be deemed sufficient if it is made to appear ' that the killing took place upon the happening of the insulting conduct or the uttering of the insulting words, *or so soon thereafter as the party killing may meet the person killed after having been informed of such insults.*' (Penal Code, art. 598.) Thus it will be seen that one of the principal ingredients or elements of ordinary manslaughter, viz., 'that the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation,' is not applicable to a case where the insulting words or conduct were not indulged in in presence of the slayer, for he (is not required personally to have heard them and) may kill on the first meeting after learning that the provocation, of which he personally knew nothing, had been committed. Up to the time of the first meeting the law prescribes no limit to the subsidence of the passion supposed to be engendered by the information received."

In such a state of the law it is certainly calculated most seriously to mislead and confuse a jury to tell them " that the provocation must arise at the time of the commission of the offense, and that the passion must not be the result of a former provocation." Because, as we have seen, such provocation may and generally does arise before the commission of the homicide, and the passion is ordinarily in fact the result of a former provocation. ( *Whaley* v. *The State,* 9 Texas Ct. App., 305.)

To our minds this portion of the charge of the court was erroneous and entirely inapplicable to the facts of this case, and we find it not only used abstractly as part of the definition of manslaughter, but it is reiterated in the court's direct application of the law to the facts, in the fifteenth paragraph of the charge. It is unnecessary to notice other objections to the charge, as the one already discussed is the most serious one, and, being erroneous and excepted to at the time it was given, will necessitate a reversal.

It may be well enough to notice the question raised for the first time in the motion in arrest of judgment, to the sufficiency of the indictment. One of the grounds of said motion was that the indictment did not show upon its face nor aver in terms that it was presented in the district court. Such an objection, as has frequently

been held, is one going to the form and not the substance of the indictment. It would be good, and could be availed of on a motion to quash (*Thomas* v. *The State*, 18 Texas Ct. App., 213, and authorities there cited), but, not being matter of substance, a motion in arrest would not reach it. "A motion in arrest of judgment shall be granted upon any ground which would be good upon exceptions to an indictment or information for any substantial defect therein." (Code Crim. Proc., art. 787.)

For error in the charge of the court, as above pointed out and discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered October 28, 1885.]